# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAUNDA BRUMMETT; GREG SISSON; THE ESTATE OF DANIEL SISSON,<br><br>Plaintiffs,<br>vs.<br>COUNTY OF SAN DIEGO; WILLIAM D. GORE; and Does 1-50,<br><br>Defendants. | CASE NO. 12cv1428-LAB (BGS)<br><br>**ORDER GRANTING IN PART MOTION TO DISMISS** |

This action concerns the wrongful death of Daniel Sisson in the Vista Detention Facility ("Facility"). Plaintiffs bring claims under 42 U.S.C. § 1983 for Eight Amendment violations (of Daniel Sisson's right to be free of cruel and unusual punishment) and for Fourteenth Amendment violations (for deprivation of the right of Daniel Sisson's parents, Shaunda Brummett and Greg Sisson's, to familial association). Plaintiffs also bring supplemental state law claims for negligence, failure to summon medical care, and wrongful death.

/ / /
/ / /
/ / /
/ / /

Defendants have moved to dismiss Sheriff William Gore as to all claims, the County of San Diego as to the first, second,[1] and fifth claims, and both named Defendants as to the third claim.

**Factual Background**

The following facts are taken from the first amended complaint (FAC). Daniel Sisson was booked into the Vista Detention Facility just after 4:00 p.m. on January 23, 2011 for possession of drugs for personal use, a violation of the terms of his probation.[2] He had a history of drug use and asthma. His history, taken at the time of booking, showed he had experienced an acute asthma attack associated with opiate withdrawal when in the same jail six months earlier. At the time, he denied using heroin daily, because he didn't want to take Vistaril, the medicine he knew would be prescribed for withdrawal.

That night he began to experience withdrawal symptoms and in the morning he told jail staff that he had been using heroin daily. After telling medical staff he did not want to take Vistaril, they prescribed Tigan, an anti-nausea drug, and a albuterol inhaler for his asthma, and returned him to his cell in the general population.

His condition worsened, and he stayed in his bunk the entire day on January 24. His symptoms included vomiting, diarrhea, nausea, which are common among those undergoing heroin withdrawal. On January 25, as Daniel Sisson lay on his back in his bunk, he waved off his scheduled sick call appointment. Officials did not enter his cell or check on his condition. He spent the day lying in his bunk or vomiting.

---

[1] The motion to dismiss ("Motion") is very confused as to which claims and on which bases it seeks dismissal. The Motion argues for dismissal of the first, fourth, and fifth claims against the County for failure to allege deliberate indifference to serious medical needs. (Motion, 7:5–6.) Then it asks for dismissal only of the first, third, and fifth causes of action against the County. (*Id*., 10:5–6.) But neither the third nor the fourth claim is brought against the County; both are brought only against Does 1–50, who appear to be individual employees at the Facility. By process of elimination, Defendants must be asking for dismissal of the second claim, for denial of life without due process.

[2] The FAC does not allege what drugs he possessed, though it emphasized he possessed them for personal use (FAC, 12:12), apparently in an effort to show Facility officials were on notice he was using heroin. But if the drugs at issue were heroin, it is easy enough for Plaintiffs to allege this. The fact that he possessed other kinds of drugs for personal use would not necessarily suggest he was also using heroin.

Later that day, he began to suffer an asthma attack induced by heroin withdrawal. Nevertheless, officials did not assist him. Daniel Sisson's cellmate "desperately and repeatedly made efforts to convince [Facility] officers that Daniel was dying and in need of immediate medical attention . . . ." (FAC, 9:9–10.) In ignoring his needs, officials were "follow[ing] the policy, practice, and custom of leaving heroin detoxifying inmates to suffer in their cell, unsupervised, and without medical attention." (*Id.*, 9:16–18.) Deputies at 8:10 p.m. finally performed a "welfare check" on his cell, and found his lifeless body. Due to the state of rigor mortis, he had been dead at least three hours. Based on remarks in the autopsy report, Plaintiffs deduce that he died around 5:00 p.m. and had been suffering an asthma attack several hours before that.

Although state law mandates that health and safety checks be performed at least hourly, because of understaffing, officers were performing safety checks less often. Sheriff Gore is alleged to be "at all relevant times the official responsible for [the Facility's] policies, practices, and customs." (FAC, 11:25–26.) Plaintiffs, on this basis, allege that he must have been aware of the risks associated with heroin withdrawal, and yet "remained deliberately indifferent to Daniel's health by continuing the policy of placing inmates undergoing heroin detoxification in general population." (*Id.*, 11:26–28.)

Besides this policy, the FAC says the Facility had a policy, practice, or custom of failing to adequately train staff to identify and treat opiate detoxification.

**Legal Standards**

A Rule 12(b)(6) Motion to dismiss tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.2001). In ruling on a Motion to dismiss, the Court accepts all allegations of material fact in the complaint as true and construes them in the light most favorable to the non-moving parties. *Cedars–Sinai Medical Center v. National League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007). The Court draws all reasonable inferences in the non-moving parties' favor. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). But the Court does not draw unreasonable inferences, *W. Mining Council v. Watt*, 643

/ / /

F.2d 618, 624 (9th Cir. 1981), nor will it supply facts plaintiffs have not pleaded. *See Ivey v. Board of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982).

To avoid dismissal, the complaint must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests" and its factual allegations must "raise the right to relief above a speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must contain enough factual allegations that, if accepted as true, would state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978) carves out an exception to the general rule that there is no *respondeat superior* liability under § 1983. That exception arises when a municipality's "official policies or established customs inflicts the constitutional injury." *Id*. at 708. A supervisor, likewise, cannot be held vicariously liable but can be held liable for implementing a policy so deficient that the policy amounts to a "repudiation of constitutional rights" and causes the violation. *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989).

An act of omission, such as a failure to train, may amount to municipal policy, but only when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

Prison officials violate the Eighth Amendment when they act with deliberate indifference to the serious medical needs of an inmate. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). To establish an Eighth Amendment violation, a plaintiff must satisfy both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012). The subjective element must involve more than "ordinary lack of due care" or negligence, *id*. (citing *Farmer* at 835), although mere negligence may suffice for state-law claims.

/ / /

**Discussion**

    **Causation**

    The Court initially notes there is a causation problem, which Defendants' Motion refers to in support of several different arguments. Regardless of what the Facility's medical policies about heroin users were, the pleadings establish they would have made no difference, at least initially, because Daniel Sisson concealed his heroin use from Facility officials. The next day, when he revealed his heroin use, he apparently declined the recommended medication and would accept only an anti-nausea medication and an asthma inhaler. And on the morning of his death, he refused to be seen by medical personnel. In these respects, officials were not deliberately indifferent to his serious medical needs.

    The FAC alleges staff were not trained to recognize heroin withdrawal symptoms or the dangers it presented. But even if they had been received that training, the FAC does not allege facts showing that prison officials knew they should have imposed medical care on an unwilling patient (as may be the case with patients who are intoxicated or mentally unstable and therefore incompetent to make decisions for themselves) by prescribing medication he did not want or requiring him to submit to a medical check.[3] Unless Plaintiffs are able to allege such facts, Eighth Amendment liability could not arise until some time after Daniel Sisson refused medical treatment on January 25. In other words, the facts as pleaded will not support Eighth Amendment liability for initial failure to treat, but can support liability for failure to regularly check on Daniel Sisson's welfare.

    The FAC argues that the Facility should have had a detoxification protocol in place, but never alleges what that protocol would have been, or what difference it would have made in this case. Because the alleged facts make clear Daniel Sisson initially avoided getting medical care for heroin withdrawal, it is especially important that these details be alleged. The FAC also argues that Facility personnel should have provided him with an

---

[3] The Court need not resolve, and is not resolving, questions of an inmates' right to control or refuse treatment. Rather, considering the question of deliberate indifference, the Court is considering whether medical staff violate an inmate's rights by acquiescing to his own request to be left alone or not given particular medications.

"individualized treatment plan" overseen by a physician. It isn't clear what this is intended to refer to, but it is clear medical staff prescribed him an anti-nausea drug and an albuterol inhaler. The FAC doesn't allege whether any physician was involved in this decision, or if not, what difference a physician's involvement would have made. Nor does the FAC allege why this did not constitute an individualized treatment plan, or why it amounted to deliberate indifference.

### Interference with Familial Relations

The fifth claim raises a substantive due process claim pursuant to the Fourteenth Amendment, based on a deprivation of liberty interest arising out the relationship with the deceased. Such a claim may be asserted by a surviving parent of a person killed by law enforcement officers. *Moreland v. Las Vegas Metropolitan Police Department*, 159 F.3d 365, 371 (9th Cir. 1998). To recover under the Fourteenth Amendment, Shaunda Brummett and Greg Sisson must, among other things, show that Defendants violated his Eighth Amendment rights. *See, e.g., id.* at n.4. In other words, this claim depends on the Eighth Amendment claim. There are other elements to such a claim, but Defendants have not briefed them, so the Court will not address them.

### Deprivation of Life Without Due Process

The second claim, for denial of life without due process of law as required under the Fourteenth Amendment, is brought by Daniel Sisson's estate and both his parents. The Court is unable to find any authority for an independent claim of this type brought by these parties, but it appears to be duplicative of the Eighth Amendment claim and the Due Process claim for deprivation of familial relationship.

### Sheriff Gore

The FAC alleges that Sheriff Gore was the policy-maker for the Facility, and that he was responsible for deciding that prisoners would not be checked on regularly. It also alleges he knew of the risks associated with heroin withdrawal. It does not allege he knew of risks heroin withdrawal posed to someone suffering from asthma. Nevertheless, it can be reasonably inferred that, at a minimum, he knew prisoners suffering from heroin withdrawal

needed to be monitored or have some kind of access to medical care, and that some such prisoners, if they suffered from secondary health problems, would be in danger.

The FAC does not allege that there was no observation of inmates or cells at all, only that the required hourly checks were not conducted. (*See* FAC, 11:4–8 (citing California regulations stating that viewing inmates using audiovisual equipment does not meet the hourly welfare check requriement).) It is clear, however, that the FAC is alleging that Daniel Sisson did not receive a "welfare check" for several hours before his death, and three hours afterward, so it is a reasonable inference that the amount of time between the checks could be several hours.

The FAC makes clear that prison officials knew Daniel Sisson was suffering a serious medical condition. Officials reviewed his medical file, knew he was enduring heroin withdrawal and asthma, prescribed medication, and offered him a medical visit. Although the FAC does not say so explicitly, it implies that some prisoners known to be in medical danger who refused treatment would be placed in the general population and not be monitored regularly. The FAC maintains Daniel Sisson's cellmate tried to summon help and could not do so, for several hours. The FAC also alleges that an asthma attack is easily treatable, so that if officials had realized he was in danger, they could have treated him for the asthma attack and saved his life.

The FAC adequately alleges that Sheriff Gore was responsible for the custom or policy of placing prisoners suffering heroin withdrawal in the general population, and the policy of not checking on them with any regularity. A policy or custom of housing some inmates with serious medical problems in the general population and then not checking on them for great lengths of time would amount to deliberate indifference to serious medical needs. This would be enough to connect Gore under a *Monell* theory to an Eighth Amendment violation.

Thus far, the analysis is straightforward. The problem for Plaintiffs is that they insert a contradictory set of allegations, which throws their theory of liability into confusion. While
/ / /

alternative or inconsistent claims are permitted under Fed. R. Civ. P. 8(d)(2) and (e),[4] the FAC must do more than allege facts that create a possibility of entitlement to relief. *See Iqbal*, 556 U.S. at 679.

In spite of the lack of checks, the FAC alleges Facility officers <u>did</u> become aware of Daniel Sisson's medical distress, because his cellmate told them and attempted to convince them to help him. (FAC, 9:15–18.) The FAC then alleges a different and somewhat contradictory "policy, practice, and custom of leaving heroin detoxifying inmates to suffer in their cell, unsupervised, and without medical attention." (*Id*., 9:16–18.) If the other allegations are true, there was no policy of denying medical attention to inmates suffering heroin withdrawal, even if they were placed with the general population; we know this, because the FAC makes clear Daniel Sisson was prescribed medication for it and offered an opportunity to see medical staff. In addition, this allegation illogically equates the placement policy with a policy of refusing requests for emergency medical help.

The problem with this set of contradictory allegations is that it renders Plaintiffs' right to recovery possible, but not plausible. In order for Sheriff Gore to be liable under an Eighth Amendment theory, his decision not to require that regular checks be conducted on inmates would have to amount to deliberate indifference to their welfare. But the allegations here leave open the possibility that Sheriff Gore knew inmates could communicate to guards if needed, and was relying on this as a way to deal with medical emergencies. In other words, Sheriff Gore's decision not to have officers conduct regular "welfare checks" might not have been the product of deliberate indifference, if he thought other protections were in place.

There is no allegation plausibly suggesting a custom or policy of being unresponsive to requests for emergency medical help, such as those Daniel Sisson's cellmate allegedly made. Therefore, even accepting that officers didn't respond to his requests for help, there

---

[4] The allegations are included in the "Background Facts" section, and the FAC gives no indication that these facts are being pleaded in the alternative. Rather, it appears to treat them as part of a coherent whole. Normally, facts pleaded in the alternative are pleaded separately, for clarity, and not pleaded as part of the facts common to all claims. *See Maloney v. Scottsdale Ins. Co.*, 256 Fed. Appx. 29, 31 (9th Cir. 2007) (explaining that inconsistent allegations incorporated into each cause of action were not pleaded in the alternative).

is no plausible allegation that their unresponsiveness was part of an official policy.

The FAC as pleaded does not plausibly state an Eighth Amendment claim against Sheriff Gore. While Defendants argue all claims against Gore should be dismissed, the Motion has focused solely on Eighth Amendment claims. Only those claims against him that depend on an Eighth Amendment violation, *i.e.*, the first, second, and fifth, will be dismissed.

### County of San Diego

Defendants argue the first, second and fifth claims must be dismissed because the alleged facts do not show deliberate indifference to serious medical needs. Because Eighth Amendment claims are not adequately pleaded against the County, the first and fifth claims must be dismissed. As noted, the second claim appears to be duplicative of the Eighth and Due Process claims, and for that reason will be dismissed as well.

### Negligence

The Motion seeks dismissal of the third claim, for negligence, which it construes as being brought against both Sheriff Gore and the County. (Motion, 6:17–18.) In fact, the third claim is against Doe Defendants only, not the County or Sheriff Gore.

## Other Matters

While the pleadings do not raise these issues, the Court is mindful of the need for economy and reasonably speedy resolution of this action. *See* Fed. R. Civ. P. 1. In order to avoid multiple rounds of amendment and motions to dismiss, the Court directs the parties to pay attention to what claims are being brought, by whom, and against whom.

For example, the first cause of action, for cruel and unusual punishment is brought, not only by Daniel Sisson's estate, but also by his parents individually, as are third and fourth causes of action, for negligence and failure to summon medical care. It is not explained under what legal theory a decedent's parents or heirs may bring claims for torts leading up to (but not including) his death; normally, such claims are brought by the estates. *See generally, Adams v. Superior Court*, 196 Cal. App. 4th 71 (Cal. App. 2 Dist., 2011) (discussing wrongful death claims, which can be brought by heirs, and survival causes of action, which existed while the decedent was alive and can be brought by the decedent's estate); *see also*

1 | Cal. Civ. Proc. Code §§ 377.20 and 377.30 (providing for survival causes of action); 377.60
2 | (wrongful death action).
3 |     In the interests of economy and efficiency, the parties are directed to pay attention
4 | to these matters as the case goes forward, and to make sure any amended claims are on
5 | firm legal footing.
6 | **Conclusion and Order**
7 |     For these reasons, the first, second, and fifth causes of action as against Sheriff Gore
8 | and the County of San Diego are **DISMISSED WITHOUT PREJUDICE**. These two'
9 | Defendants' request to dismiss the third claim is **DENIED AS MOOT**, because that claim is
10 | not brought against them. Sheriff Gore's request to dismiss the fourth claim against him is
11 | **DENIED AS MOOT**, because that claim is not brought against him. Sheriff Gore's request
12 | to dismiss the sixth claim as against him is **DENIED**.
13 |     If Plaintiffs wish to amend their complaint, they must do so within 28 calendar days
14 | of the date this order is issued. If Plaintiffs do not amend, the claims the Court has dismissed
15 | without prejudice will remain dismissed and will be deemed abandoned.
16 |
17 |     **IT IS SO ORDERED**.
18 | DATED: March 25, 2013
19 |
20 |                    **HONORABLE LARRY ALAN BURNS**
                       United States District Judge